## REEVES v KMART CORPORATION

Docket No. 197796. Submitted January 13, 1998, at Detroit. Decided May 5, 1998, at 9:05 A.M. Leave to appeal sought.

Steve Reeves, III, as personal representative of the estates of Kevin M. Reeves and Kevin M. Reeves, Jr., and Kevin Redmond, as personal representative of the estates of Shawn E. Reeves and Tanesha Reeves, brought an action in the Wayne Circuit Court against Kmart Corporation and others and an action in the Court of Claims against the Department of Transportation in connection with the deaths of the decedents from injuries sustained when their automobile was struck from the rear on the service drive of an exit of a Detroit freeway by a waste disposal truck loaded with garbage from a Kmart store. The plaintiffs alleged that Kmart owed and breached a duty to the decedents to exercise due care in selecting the company that hauled its garbage on an independent contractor basis and that the Department of Transportation is liable under the highway exception to governmental immunity for failing to post speed limit signs on the service drive. The actions were consolidated in the circuit court, where Brian K. Zahra, J., granted summary disposition for Kmart and James R. Chylinski, J., granted summary disposition for the department. The plaintiffs appealed.

The Court of Appeals *held*:

1. The trial court did not err in granting summary disposition for Kmart. Michigan law does not subject one who hires an independent contractor to liability for physical harm to third persons caused by the failure to exercise reasonable care to employ a competent and careful independent contractor.

2. The trial court did not err in granting summary disposition for the Department of Transportation. The plaintiffs failed to establish that there was a genuine issue of fact regarding whether the absence of speed limit signs was a proximate cause of the accident. The evidence indicated that the garbage truck, even at the excessive speed at which it was traveling, could have stopped in time to avoid the collision had its brakes not been defective or inoperable.

Affirmed.

NEGLIGENCE — INDEPENDENT CONTRACTORS — HIRING — LIABILITY TO THIRD PARTIES.

A person who hires an independent contractor incurs no liability under Michigan law for physical harm to third persons caused by the failure to exercise reasonable care to employ a competent and careful independent contractor.

*Zeff and Zeff, P.C.* (by *Paul W. Broschay*), for the appellants.

*Pedersen, Keenan, King, Wachsberg & Andrzejak* (by *Thomas E. Keenan*), for Kmart Corporation.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Harold J. Martin*, Assistant Attorney General, for Department of Transportation.

Before: MARKMAN, P.J., and MCDONALD and CAVANAGH, JJ.

CAVANAGH, J. Plaintiff Steve Reeves, III, as personal representative of the estates of Kevin Reeves and Kevin Reeves, Jr., and plaintiff Kevin Redmond, as personal representative of the estates of Shawn Reeves and Tanesha Reeves, appeal as of right the trial court orders granting summary disposition to defendants Kmart Corporation and the Michigan Department of Transportation (MDOT). We affirm.

In 1992, Doug Perdue, a district manager with defendant Kmart, became concerned that individual Kmart stores were paying too much for waste removal. Session Recycling, Inc.,[1] sent Kmart a letter describing itself as a minority-owned waste-hauling firm that recycled to the maximum possible extent and avoided the use of landfills wherever possible. After meeting with David Cartwright, a representative

---

[1] In November 1993, Session changed its name to Central Recycling. In order to avoid confusion, we will refer to the company as Session.

of Session, and negotiating a price that represented "up to 50% savings" for the service at various stores, Perdue arranged for Cartwright to make a presentation at a meeting of store managers. At the meeting, Cartwright distributed an eight-page brochure that described the company as having experienced employees, fully automated trucks, and over thirty years of experience in waste management. The brochure also contained the names of Session's existing clientele; several Fortune 500 companies were included on the list.

Several Kmart stores subsequently contracted with Session to have the latter pick up their garbage. The following procedure was used for waste disposal: When the garbage bin at a Kmart store was nearly full, store personnel would call for a pick-up. Session would then go to the store, pick up the full bin, leave an empty one, and get a signed receipt showing that the pick-up had been made. A Kmart employee testified that the pick-up procedure did not require Kmart employees to leave the store.

On January 7, 1994, a Session truck driven by Richard Hayter picked up garbage from a Kmart store in Warren. Subsequently, Hayter got off the Lodge Freeway at West Grand Boulevard, traveling in excess of the speed limit, and struck three cars on the service drive before colliding with a Ford Escort. The occupants of the Escort, Kevin and Shawn Reeves and their two minor children, Kevin, Jr., and Tanesha, were all killed.

An inspection of the truck following the accident revealed many mechanical defects, several of which would have resulted in the vehicle being placed out of service following an inspection. Among the more seri-

ous problems were that four of the six brakes on the truck were defective, and a fifth was inoperative; eight of the ten tires were underinflated; the vehicle was both overloaded and improperly loaded; and there was excess free play in the steering mechanism. The inspector stated in his report, "In 35 years of heavy truck inspections I have not experienced [such] disregard for the laws of safe truck operation or contempt for the motoring public." Two employees of Session testified in affidavits that, before the day of the accident, Kmart employees had made comments regarding the condition of the truck such as "Will you make it back with that truck?" and "That truck looks dangerous the way it is loaded."

The MDOT had designated speed limit signs indicating that drivers should slow to twenty-five miles an hour on the exit ramp. However, at the time of the accident, there were no such signs on the exit ramp.

Plaintiffs filed a wrongful death action in the Wayne Circuit Court against a number of defendants, including Session, Hayter, and Kmart. Plaintiffs also filed a lawsuit in the Court of Claims against the MDOT, alleging that it was liable for its failure to have posted traffic signs to alert drivers to reduce speed while on the exit ramp. The two actions were subsequently consolidated in the Wayne Circuit Court. With the exceptions of Kmart and the MDOT, all the defendants have either been dismissed or have entered settlement agreements with plaintiffs and are not party to this appeal.

On August 28, 1995, the MDOT moved for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10). The MDOT argued that it did not have jurisdiction over the area of the Lodge Freeway where the acci-

dent occurred, that it was immune from suit because the alleged defect in the highway was not on the improved portion of the roadway, and that there was no genuine issue of material fact that the absence of speed limit signs on the exit ramp was not a proximate cause of the accident. On September 25, 1995, the trial court granted the MDOT's motion on the bases that the speed limit signs, if installed, would not have been on the traveled portion of the freeway, and there was no genuine issue of material fact that the absence of speed limit signs was not a proximate cause of the accident.

On August 8, 1995, Kmart filed a motion for summary disposition, which the trial court denied. Plaintiffs then filed an amended complaint in which they narrowed their claims. Kmart renewed its motion for summary disposition on November 30, 1995. On July 17, 1996, the trial court issued an opinion and order granting Kmart's motion.[2] The court concluded that Kmart did not owe a duty to plaintiffs' decedents to exercise care in the selection of an independent contractor and to monitor its independent contractor to ensure safe execution of its duties, and therefore granted Kmart's motion for summary disposition pursuant to MCR 2.116(C)(8). The court further concluded that, if such a duty exists, the duty requires only that Kmart not be reckless in its selection of an

---

[2] This case was originally assigned to Judge James R. Chylinski. Judge Chylinski granted the MDOT's motion for summary disposition on September 25, 1995. On November 30, 1995, Judge Chylinski granted Kmart's motion for summary disposition. Plaintiffs successfully moved to have Judge Chylinski disqualified from the case, and it was then assigned to Judge Brian K. Zahra. Judge Zahra then granted plaintiffs' motion to have the order granting summary disposition set aside. After addressing Kmart's motion for summary disposition on the merits, Judge Zahra granted the motion.

independent contractor. Thus, because plaintiffs failed to present any competent evidence to suggest that Kmart was reckless in selecting Session for waste removal, summary disposition still would be appropriate under MCR 2.116(C)(10).

I

Plaintiffs first argue that the trial court erred in finding that Kmart owed no duty to plaintiffs' decedents in its selection and retention of an independent contractor. This is a question of law that we review de novo. See *Schadewald v Brulé*, 225 Mich App 26, 35; 570 NW2d 788 (1997).

The general rule is that an employer of an independent contractor is not liable for the contractor's negligence. *Bosak v Hutchinson*, 422 Mich 712, 724; 375 NW2d 333 (1985); *Janice v Hondzinski*, 176 Mich App 49, 56; 439 NW2d 276 (1989). However, the Supreme Court has provided two exceptions to this general rule. A party may be liable for the negligence of an independent contractor where the party retains and exercises control over the contractor or where the work is inherently dangerous. *Funk v General Motors Corp*, 392 Mich 91, 108-110; 220 NW2d 641 (1974), overruled in part on other grounds in *Hardy v Monsanto Enviro-Chem Systems, Inc*, 414 Mich 29; 323 NW2d 270 (1982). Although *Funk* addressed the rule in the context of a landowner and the contractor hired to build a structure on the land, we do not believe, and neither party argues, that the Supreme Court intended the rule to be limited to that factual situation.

Plaintiffs contend that *Funk* supports their claim that Michigan recognizes a duty in the selection and

retention of an independent contractor. Plaintiffs rely on the following language from *Funk*: "Ordinarily a landowner is not responsible for injuries caused by a carefully selected contractor to whom he has delegated the task of erecting a structure." *Funk, supra* at 101. Plaintiffs argue that the use of the words "carefully selected" to modify contractor imposes a duty of care upon an employer when selecting a contractor. We disagree. First, in *Funk*, the Court found that the defendant could be held liable for the plaintiff's injuries because it had retained control over the manner in which the work was to be performed, not because it had failed to use care in selecting its contractors. See *id.* at 108. The *Funk* Court did not address whether a general duty exists regarding the selection of an independent contractor.

Second, as Kmart contends, plaintiffs' interpretation of this language creates a Catch-22 for anyone who hires an independent contractor. In asserting that Kmart did not take due care in employing and retaining Session, plaintiffs argue that Kmart should have investigated Session to ensure that its trucks were mechanically safe, that the trucks were properly loaded, and that the drivers were qualified. However, had Kmart taken these actions, plaintiffs could then reasonably claim that it was liable under *Funk* because it had retained control of the enterprise. Thus, under plaintiffs' construction of *Funk*, Kmart would be liable for an injury if it carefully monitored an independent contractor *and* if it did not monitor the contractor at all.

Finally, the *Funk* Court explained that mere owners are not ordinarily liable because owners are not typically professional builders and are not knowledge-

able concerning safety measures. See *id.* at 104-105. The same reasoning applies in the instant case. Kmart is not in the business of picking up and disposing of garbage. Accordingly, supervising the procedure used in garbage collection and removal is not part of its typical activities. Indeed, people generally hire independent contractors to do work that they do not have the time or the expertise to do themselves. It would not be efficient, then, to require them to learn enough about the work to oversee its performance and supervise safety procedures.

Plaintiffs maintain that Kmart should have known that Session would be unable to perform the terms of the contract in a safe manner because the price was substantially lower than Kmart's previous contractors charged. In *Funk*, the Supreme Court expressly declined to address whether an owner should be subject to liability for the negligence of his contractor where an unusually low bid is submitted. See *id.* at 110, n 14. We do not think it reasonable to assume that a lower price is synonymous with a lack of competence. While it is possible that the lower price offered by a contractor may indicate substandard service, it may also mean that the contractor is more efficient than its competitors, the competitors are overpriced, or the contractor is an aggressive company willing to forgo profits temporarily in order to increase its market share.

Plaintiffs also argue that Michigan has adopted § 411 of the Restatement of Torts, 2d, which addresses the negligent hiring of a contractor. The Restatement provides:

> An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
>
> (b) to perform any duty which the employer owes to third persons. [2 Restatement Torts, 2d, § 411, p 376.]

Plaintiffs point to references to this section in *White v Chrysler Corp*, 421 Mich 192; 364 NW2d 619 (1984), and *Meagher v McNeely & Lincoln, Inc*, 212 Mich App 154, 156; 536 NW2d 851 (1995), as support for their claim that Michigan has adopted § 411. After reviewing *White* and *Meagher*, we conclude that they do not support plaintiffs' assertion that Michigan has adopted § 411. *White* involved a claim of negligent entrustment. *White, supra* at 197. The citation to the Restatement occurs in a footnote. See *id.* at 202, n 12. We conclude that the *White* Court's reference to § 411 was dicta. *Meagher* similarly does not establish that Michigan has adopted § 411. The *Meagher* panel specifically stated that it is unclear whether Michigan recognizes a duty for the negligent hiring or selection of a contractor.[3] *Meagher, supra* at 155. The *Meagher* Court did cite § 411 and comment c to that section[4] in

---

[3] Another panel of this Court has also stated that it is unclear whether Michigan recognizes a duty in the hiring or selection of a contractor. See *Janice, supra* at 56.

[4] Comment c provides in pertinent part:

The amount of care which should be exercised in selecting an independent contractor is that which a reasonable man would exercise under the circumstances, and therefore varies as the circumstances vary.

Certain factors are important: (1) the danger to which others will be exposed if the contractor's work is not properly done; (2) the character of the work to be done—whether the work lies within the competence of the average man or is work which can properly

support of the following statement: "[A]bsent unique circumstances not present here, the employer had no duty to investigate the contractor and was free to assume the contractor was of good reputation and competent to do the work safely." *Meagher, supra* at 156. While the *Meagher* panel did not elaborate on the meaning of "unique circumstances," we assume that it was referring to the two exceptions set forth in *Funk.* Accordingly, to the extent that § 411 of the Restatement conflicts with *Funk*, we conclude that it has not been adopted in Michigan.

In support of their claim, plaintiffs have supplied the affidavits of three experts in the trucking industry who have averred that corporations have a duty to investigate and determine whether the trucking companies they hire are competent. However, whether a defendant owes any duty to a plaintiff to avoid negligent conduct in a particular circumstance is a question of law. *Hughes v PMG Building, Inc,* 227 Mich App 1, 5; 574 NW2d 691 (1997). The duty to interpret and apply the law has been allocated to the courts, not to the parties' expert witnesses. *Hottmann v Hottmann,* 226 Mich App 171, 179; 572 NW2d 259 (1997).

As discussed above, we conclude that Michigan has not recognized a duty requiring an employer to exercise care in the selection and retention of an indepen-

---

be done only by persons possessing special skill and training; and (3) the existence of a relation between the parties which imposes upon the one a peculiar duty of protecting the other.

Thus, there is some overlap between the factors that the Restatement concludes require a higher degree of care and the exceptions of retained control and inherently dangerous activity set out in *Funk.*

dent contractor.[5] Furthermore, we hold that such a duty does not exist. As the trial court explained in its opinion:

> When an independent contractor is called upon to perform tasks that a person of average intelligence can perform with minimal or no training and that task may be accomplished by a multiplicity of methods, the person hiring the independent contractor ought to be able to presume that the independent contractor can competently perform the duties assigned to her. There should be no need to investigate to determine whether the independent contractor has the resources and abilities to perform properly the assigned tasks.

---

[5] Plaintiffs cite several additional cases in support of their contention that Michigan recognizes a duty on the part of an employer to exercise care in the selection of an independent contractor. However, we conclude that these cases do not support that proposition. In *Moody v Pulte Homes, Inc*, 423 Mich 150; 378 NW2d 319 (1985), the plaintiff argued that the trial court erred in failing to give certain instructions to the jury regarding the employer's duty to hire a careful and competent contractor. *Id.* at 180-181. The Court held that the trial court did not err in failing to give these instructions, because no evidence was presented in support of the plaintiff's claims. *Id.* at 158. Thus, the Court never addressed whether the substance of the plaintiff's proposed jury instructions was an accurate statement of Michigan law.

In *Cary v Thomas*, 345 Mich 616, 629-630; 76 NW2d 817 (1956), the Supreme Court cited with approval the following passage from 39 CJ, Master and Servant, § 1530, p 1324:

> [T]he general rule deducible from the decisions and the one now universally recognized is that, where the relation of an independent contract exists, and *due diligence has been exercised in selecting a competent contractor*, and the thing contracted to be done is not in itself a nuisance, nor will necessarily result in a nuisance if proper precautionary measures are used, and an injury to a third person results, not from the fact that the work is done, but from the wrongful or negligent manner of doing it by a contractor or his servants, the contractee is not liable therefor. [Emphasis added.]

However, to the extent that the Supreme Court's approval of this language indicates the existence of a duty in the selection of an independent contractor, we conclude that the duty has been limited by the Court's subsequent decision in *Funk, supra.*

To hold otherwise would require one who hires a lawn service to inspect the truck used to transport equipment to insure not only that the truck is capable of transporting the lawn mowers and other related equipment, but also to determine whether it is properly maintained and suitable for use *i.e.* check the tires, brakes, oil, transmission and anything else that may require regular and routine maintenance. That would still not be enough to guard against liability. The would-be employer of the lawn service would have to obtain the driving records of the employees to make sure they can safely operate the truck. Finally, a financial investigation of the lawn service company would be required to make sure it is not under capitalized and likely to neglect the maintenance of its equipment. Similar investigations would be required before hiring any type of laborer as an independent contractor. The economic costs and time constraints associated with such investigations would put many competent laborers out of business.

The implications arising from imposition of the duty advocated by plaintiffs are too far reaching. Michigan courts have recognized that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." *Aetna [Casaulty & Surety Co] v Ralph Wilson Plastics*, 202 Mich App 540, 547-548 [509 NW2d 520] (1993); *Tasca v GTE Products Corp*, 175 Mich App 617, 624 [438 NW2d 625] (1988). In this case the independent contractor contractually undertook the duty to remove and dispose of trash from Kmart's premises. Kmart ought to be able to rely upon its independent contractor [to be] capable of performing properly this menial and mundane task.

In the instant case, plaintiffs have not claimed that garbage collection is an inherently dangerous activity or that Kmart retained control of the garbage collection operations at its stores. Accordingly, Kmart was "free to assume the contractor was of good reputation and competent to do the work safely." *Meagher, supra* at 156. Because plaintiffs have not presented

facts establishing that Kmart owed a duty to plaintiffs' decedents, their negligence claims fail as a matter of law. See *Smith v Kowalski*, 223 Mich App 610, 613; 567 NW2d 463 (1997). Therefore, the trial court did not err in granting Kmart's motion for summary disposition pursuant to MCR 2.116(C)(8).

II

Plaintiffs also argue that the trial court erred in granting the MDOT's motion for summary disposition. The trial court held that the MDOT was immune from suit under the highway exception to governmental immunity, MCL 691.1402; MSA 3.996(102), because the speed limit signs would not have been on the traveled portion of the roadway. The trial court further concluded that the absence of speed limit signs did not constitute a proximate cause of the accident.

After the trial court granted the MDOT's motion for summary disposition, the Supreme Court decided *Pick v Szymczak*, 451 Mich 607; 548 NW2d 603 (1996). In *Pick*, the Court held that the duty to maintain a highway in reasonable repair includes "a duty to provide adequate warning signs or traffic control devices at known points of hazard . . . under the highway exception of the governmental tort liability act." *Id.* at 619. To be a "point of hazard" for purposes of the highway exception, the condition must be one that uniquely affects vehicular travel on the improved portion of the roadway, as opposed to a condition that generally affects the roadway and its surrounding environment. *Id.* at 623.

Because the trial court did not have the benefit of *Pick*, it did not address whether the West Grand Boulevard exit ramp from the southbound Lodge

Freeway constituted a known point of hazard. However, it is unnecessary to remand this case to the trial court for resolution of the question because we conclude that the trial court correctly found that the absence of speed limit signs on the exit ramp was not a proximate cause of the accident.[6]

To establish a prima facie case of negligence, a plaintiff must demonstrate that the defendant's breach of its duty was the proximate cause of the plaintiff's injuries. *Richardson v Michigan Humane Society*, 221 Mich App 526, 528; 561 NW2d 873 (1997). The Supreme Court has explained:

> [P]roving proximate cause actually entails proof of two separate elements: (1) cause in fact, and (2) legal cause, also known as "proximate cause."
>
> The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. A plaintiff must adequately establish cause in fact in order for legal cause or "proximate cause" to become a relevant issue. [*Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994) (citations omitted).]

---

[6] While resolution of the issue is not necessary in the present case, we question whether a standard freeway exit ramp constitutes a known point of hazard within the meaning of the highway exception. A special hazard has been found to exist where a tree limb that had been partially severed by a storm dangled over the roadway for more than a month before falling on a car, *McKeen v Tisch (On Remand)*, 223 Mich App 721, 724; 567 NW2d 487 (1997), and where the proximity of a railroad crossing to an intersection created a danger to motorists making turns, *Iovino v Michigan*, 228 Mich App 125, 134; 577 NW2d 193 (1998). From our review of the record, there is no indication that the particular ramp is any different from the numerous other freeway exit ramps in this state or that there is something unique about its design, location, or characteristics that creates a special hazard to drivers.

Normally the issue of causation is for the jury. However, if there is no issue of material fact, the trial court may decide the issue itself. *Halbrook v Honda Motor Co, Ltd*, 224 Mich App 437, 446; 569 NW2d 836 (1997). In the present case, we find that plaintiffs did not establish a genuine issue of factual causation.

In support of its motion for summary disposition, the MDOT attached portions of the deposition transcripts of two of plaintiffs' experts, Claude Travis and Judson Matthias. Travis testified that Hayter was traveling at fifty-five miles an hour when he reached the top of the ramp. Travis further stated that, even at that speed, the truck would have been able to stop in time to avoid the accident if the tires on the truck had been properly inflated, the tread depth on the tires had been normal, the truck had been properly loaded, and all six brakes had been functioning. Matthias testified that over 5.5 seconds elapsed from the time the truck left the exit ramp to the time of impact, and this was more than enough time for Hayter to see and react to the presence of the vehicles stopped on the service drive. Matthias further testified that, had the truck been equipped with adequate brakes, Hayter would have been able to stop the vehicle in time to avoid the collision.

Plaintiffs do not dispute that the truck was in poor condition, that it was both overloaded and improperly loaded, and that Hayter was traveling too fast. Plaintiffs merely assert that the truck could have stopped if it had been traveling more slowly while on the exit ramp, and therefore more slowly at the time it entered the service drive. Plaintiffs point to the affidavit of Hayter, in which he stated that he believes that

he would have slowed down if he had seen speed limit signs on the exit ramp.[7]

However, even accepting Hayter's testimony as true,[8] we conclude that it does not create a genuine issue of material fact regarding the issue of causation. Two of plaintiffs' experts testified that, even at the speed at which Hayter was traveling at the time he reached the service drive, he would have been able to stop the truck in time to avoid the collision if the truck had been properly maintained and outfitted with functioning brakes. Plaintiffs offered no contrary evidence. Plaintiffs therefore have not established that, but for the absence of speed limit signs on the exit ramp, the accident would not have occurred. Because plaintiffs have not shown a genuine issue of factual causation, the trial court did not err in granting the MDOT's motion for summary disposition.

---

[7] In arguing that the trial court erred in finding that the absence of speed limit signs was a proximate cause of the accident, plaintiffs rely on the deposition testimony of the MDOT's accident reconstruction expert, Donald Rudny, and the MDOT's safety consultant, Howard Bosscher. However, although plaintiffs quoted this deposition testimony in their brief in opposition to the MDOT's motion for summary disposition, plaintiffs failed to attach to their brief excerpts from the actual deposition transcripts. Plaintiffs have attached excerpts of the deposition transcripts to their brief on appeal; however, this Court is limited to the record established by the trial court. A party may not expand the record on appeal. *Trail Clinic, PC v Bloch,* 114 Mich App 700, 713; 319 NW2d 638 (1982); see MCR 7.210. In any case, even if plaintiffs had included the depositions of Rudny and Bosscher in the record, they have failed to explain how the testimony supports their claim that the lack of speed limit signs on the ramp constituted a proximate cause of the injuries to plaintiffs' decedents.

[8] The trial court noted that it found Hayter's affidavit to be self-serving. Because it was undisputed that Session's facilities were located one-quarter mile south of the site of the accident and Hayter had used the exit ramp many times previously, the veracity of Hayter's testimony is open to doubt. Nevertheless, a court may not weigh credibility in deciding a motion for summary disposition. *Henderson v State Farm Fire & Casualty Co,* 225 Mich App 703, 709; 572 NW2d 216 (1997).

Affirmed. Defendants, being the prevailing parties, may tax costs pursuant to MCR 7.219.