Deborah Ann SPRAGUE, as Personal Representative of the Estate of Eric Todd Sprague, deceased, Plaintiff,

v.

TOLL BROS., a Pennsylvania corporation, Defendant.

No. 01–74580.

United States District Court, E.D. Michigan, Southern Division.

April 16, 2003.

Nicholas Manikas, Brescoll Assoc., Birmingham, MI, for Plaintiff.

Lee C. Patton, Cornelius C. Hare, Jr., Sullivan, Ward, Southfield, MI, Frank J. Stancato, Southgate, MI, James K. Thome, Vandeveer Garzia, Troy, MI, for Defendant.

## OPINION AND ORDER

ZATKOFF, Chief Judge.

### I. INTRODUCTION

This matter is before the Court on the following motion: Motion for Summary Judgment on Behalf of Defendant Toll Bros., Inc. Plaintiff responded and Defendant replied. The Court finds that the parties have adequately set forth the relevant law and facts, and that oral argument would not aid in the disposition of the instant ·motion. *See* E.D. MICH. LR 7.1(e)(2). Accordingly, the Court ORDERS that the motion be decided on the briefs submitted. For the reasons set forth below, Motion for Summary Judgment on Behalf of Defendant Toll Bros., Inc. is GRANTED.

### II. BACKGROUND

This action arises out of the death of Mr. Eric Sprague. Plaintiff filed an amended

complaint on June 21, 2002. In her complaint, Plaintiff generally alleges that Mr. Sprague's death was the result of Defendant's negligence. Plaintiff's complaint does not contain any separately enumerated counts.

At the time of the events underlying this action, Defendant was a real estate developer, and was in the process of developing a residential community known as "the Estates of Waldon Creek." Defendant hired a contracting firm known as QHR, LLC (hereinafter "QHR") to provide roofing services. Mr. Sprague worked for QHR.

Some of the houses in Defendant's development had a "greenhouse" roof area that contained a skylight. On December 5, 2000, at around 3:00 p.m., Defendant's Assistant Construction Manager, Mr. Paul McCue, requested Mr. Sprague to install flashing around the skylight area of one of the houses in Defendant's development. Mr. McCue also told Mr. Sprague that it was too cold and windy to perform the job that day, and suggested that Mr. Sprague should begin working on the project the following day. Mr. Sprague, however, decided that he would rather finish the project that day. After that conversation, Mr. Sprague began performing the work. Mr. McCue left for the day at about 4:00 p.m. The next day, shortly after he arrived at the worksite, Mr. McCue discovered Mr. Sprague's body on the ground near the roof that Mr. Sprague was working on. Although there are no eyewitnesses to Mr. Sprague's death, it appears that he fell to his death.

The greenhouse roof area from which Mr. Sprague apparently fell[1] was twelve feet off the ground. Said roofing area had a rather steep pitch, rising six inches for every horizontal foot. In addition, said roofing area was rather small, measuring five feet by eight feet. Plaintiff alleges that the dimensions of this roofing area made Mr. Sprague's assignment a perilous one, and that the use of safety equipment, such as a toe board, was insufficient to protect him from injury. Moreover, Plaintiff alleges that Mr. Sprague routinely failed to use such safety equipment, and was not using any safety equipment at the time of his fall; Plaintiff alleges that Defendant may be held liable for these failings.

In response, Defendant argues that QHR was an independent contractor, and therefore, Defendant had no duty to ensure that Mr. Sprague was properly using his safety equipment. Moreover, Defendant argues that the working environment at issue was not unreasonably dangerous, and that Defendant did not have control over Mr. Sprague's work. Defendant's motion for summary judgment is based on these arguments.

### III. LEGAL STANDARD

Summary judgment is appropriate only if the answers to interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV.P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most

---

**1.** It is unclear whether Mr. Sprague fell from the greenhouse roof area or from his ladder, as there are no witnesses. For present purposes, the Court shall assume that he fell from the greenhouse roof area.

favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993).

### IV. ANALYSIS

 It is not disputed that QHR was an independent contractor. Under Michigan law,[2] an employer of an independent contractor is generally not liable for injuries sustained by the independent contractor's employees. *See Groncki v. Detroit Edison Co.*, 453 Mich. 644, 557 N.W.2d 289, 297 (1996). As with most general rules, there are exceptions to this rule; an employer may be liable to the independent contractor's employees:

1) when the owner retains control over the project, *see Funk v. General Motors*, [392 Mich. 91,] 220 N.W.2d 641, 646–48 (Mich.1974);

2) where an obvious danger exists in a work-area that is shared by several independent contractors, and the one who retained the independent contractors fails to take precautions against such a danger, *see id.* at 645–46; and,

3) where the owner hires a contractor to perform an activity that poses a special or peculiar risk or danger to others unless great care is used, *Samodi v. Chrysler Corp.*, [178 Mich.App. 252,] 443 N.W.2d 391, 393 (Mich.Ct.App.1989).

In addition, Plaintiff argues that the following two exceptions also exist:

1) an employer may be liable for negligently administering a contract, *see Clark v. Dalman*, [379 Mich. 251,] 150 N.W.2d 722[755] (Mich.1967); and,

2) negligent retention of a careless or incompetent independent contractor, *see Funk*, 220 N.W.2d at 644.

Defendant moves for summary judgment, and argues: 1) that this activity was not inherently dangerous; 2) that Defendant did not retain control of the project; and

---

**2.** Plaintiff is from Michigan, whereas Defendant is domiciled in Pennsylvania. Despite that, both parties assume that Michigan law controls this action. This assumption is correct. For tort claims, Michigan presumes that the law of the forum state applies, unless there is a rational reason to apply another state's law. *See Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 562 N.W.2d 466, 471 (1997). There is a rational reason to apply another state's law if that state's interest in having its law applied outweighs the forum state's interest in having its own law applied. *See id.* at 470–71. Here, Defendant is from Pennsylvania. That fact alone, however, does not justify the use of Pennsylvania law. *See id.* (citing *Home Ins. Co. v. Dick*, 281 U.S. 397, 408, 50 S.Ct. 338, 74 L.Ed. 926 (1930)). Even if it were, the Court finds that Michigan has an interest in applying its own laws because Plaintiff is a resident of Michigan, and the allegedly tortious conduct occurred in Michigan. Therefore, the Court shall apply Michigan tort law.

3) any danger was open and obvious. The Court shall analyze each argument in turn.

## A. Inherently Dangerous Activity

■ "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise." *Bosak v. Hutchinson*, 422 Mich. 712, 375 N.W.2d 333, 339 (1985) (quoting Restatement (Second) of Torts, § 416 cmt. d (1965)). In other words, under Michigan law, something akin to strict liability exists for an employer who hires an independent contractor to perform an inherently dangerous activity. *See id.* at 339 (quoting *Vannoy v. City of Warren*, 15 Mich.App. 158, 166 N.W.2d 486, 489 (1968)).

Under Michigan law, an inherently dangerous activity is defined as one that "is likely to create a peculiar risk of physical harm or if the work involves a special danger inherent in or normal to the work that the employer reasonably should have known about at the inception of the contract." *Oberle v. Hawthorne Metal Products Co.*, 192 Mich.App. 265, 480 N.W.2d 330, 332–33 (1991). A routine activity, however, is not considered inherently dangerous when appropriate safety measures could be taken to prevent an injury. *See Szymanski v. K Mart Corp.*, 196 Mich. App. 427, 493 N.W.2d 460, 463 (1992) (rev'd on other grounds).

Although the question of whether an activity is inherently dangerous is typically a question of fact for the jury, *see Phillips v. Mazda Motor Mfg. (USA) Corp.*, 204 Mich.App. 401, 516 N.W.2d 502, 506 (1994), the Court finds that this activity, as a matter of law, was not inherently dangerous because the risk of falling off the roof could have been eliminated by the proper use of appropriate safety measures. Attached to Plaintiff's response brief is the deposition of Mr. Patrick Sullivan, who is employed as a consultant with the Michigan Occupational Safety and Health Administration (hereinafter "MIOSHA"). Mr. Sullivan visited the worksite the day after Mr. Sprague's death. While there, he noted that the roof at issue was twelve feet off the ground at its lowest point. In his deposition, he stated that any roof that is over six feet high poses a serious risk of danger to anyone who would work on such a roof; consequently, MIOSHA requires that some type of fall-prevention device be used by anyone who would work on such a roof, such as a body harness, or some type of catch platform.[3] When properly used, such a device would eliminate the risk of a fall. For instance, Mr. Sullivan described how a body harness would prevent a fall:

Q: Okay. How exactly does the personal fall arrest system work, the one with the harness and the lanyard?

A: Well, you're wearing a body harness and there is a lanyard attached to a D-ring on the body harness and then the other end of the body harness is attached to a rope or a life line that is anchored somewhere on the roof or to a structure that you're working on, so that if you fall, you are essentially hanging from the rope and body harness.

Q: As opposed to reaching the ground?

A: That's correct.

*See* Resp. to Def.'s Mot. for Summ. J., Ex. 13, 58–59. In short, there are means avail-

---

**3.** These requirements may be found at MICH. ADMIN. CODE r. 408.44501, 408.44502 (2002) (expressly adopting 29 CFR 1926.500– 1926.503).

able for preventing a fall, such as the one at issue in this action, from occurring.

As mentioned above, the Michigan courts have consistently held that an activity is not inherently dangerous when the risk involved could be eliminated by the proper use of appropriate safety equipment. In *Szymanski v. K Mart Corp.*, 196 Mich.App. 427, 493 N.W.2d 460, 463 (1992) (vacated on other grounds), the Michigan Court of Appeals found that washing a window that was forty feet above the ground was not inherently dangerous because "any danger of serious physical injury from this activity could have been prevented by the use of well-recognized safety measures, i.e., safety belts and safety lines. The risk of injury was not inherent to the work being done, but was created by the failure to use well-recognized safety measures." Likewise, in *Rasmussen v. Louisville Ladder*, 211 Mich.App. 541, 536 N.W.2d 221, 225 (1995) (vacated on other grounds), the Michigan Court of Appeals found that doing work on metal scaffolding was not inherently dangerous because "[r]easonable safeguards against injury were expected to be used." Finally, in an unpublished opinion, the Michigan Court of Appeals stated that working on the roof of a house was not unreasonably dangerous, and denied the plaintiff's request for relief, in part, because, "plaintiff admits this injury may have been avoided with the use of safety devices." *Perkoviq v. Delcor Homes–Lake Shore Pointe, Ltd.*, 1999 WL 33435394, *3 (Mich.Ct.App. Oct.1, 1999) (rev'd on other grounds). In conclusion, the Court finds that the activity that Plaintiff's decedent was engaged in was not inherently dangerous.

At this juncture, this finding does not mean that Defendant is successful, as the Court shall now examine whether Defendant retained control over the property.

**B. Control Over the Roofing Activities**

Under Michigan law, "one who entrusts work to an independent contractor, but who retains control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts, § 414 (1965); *Tillman v. Great Lakes Steel Corp.*, 17 F.Supp.2d 672, 675 (E.D.Mich. 1998) (citations omitted). In order to impose liability on an owner, the owner must do more than simply retain the general right to control work stoppages, or to require reports from its contractors, or to suggest how a project is to be completed, as these rights are typically reserved by an owner. *See Tillman*, 17 F.Supp.2d at 676 (citing Restatement (Second) of Torts, § 414 cmt. c (1965)). Rather, the owner needs to have some control over the way that the contractor performs the work; in other words, the owner must retain control in such a way that the contractor is not free to do the work his own way. *See id.* Whether the owner has retained such control is usually a question of fact for a jury. *See Phillips v. Mazda Motor Mfg. (USA) Corp.*, 204 Mich.App. 401, 516 N.W.2d 502, 507 (1994).

■ Upon reviewing the documents submitted, and reading the depositions that were provided, the Court finds that there is no genuine issue of material fact, and that Defendant did not exude sufficient control to be held liable in this action. The evidence submitted demonstrates that the incidences of Defendant's control over QHR, as well as Defendant's other contractors, were generally limited to the following: 1) Defendant provided its contractors with blueprints during the contract bidding process, but typically provided no guidance in terms of how much material

was needed, or how long a project would take; 2) Defendant inspected the work of its contractors; 3) Defendant required its contractors to comply with the safety requirements imposed by OSHA and MIOSHA; and 4) Defendant required its contractors to keep the work area clean, and provided dumpsters for its contractors to dispose of their rubbish. The evidence submitted also demonstrates that Defendant abdicated control of the work to its contractors. For instance, Defendant seldom gave its contractors, including QHR, a particular date as to when the contractor's work was to either begin or end, rather, the contractors were told when they could begin working on a project, and the contractors, including QHR, provided their own materials, without receiving any instructions as to any particular quantities of material that were needed. Thus, the Court finds that Defendant did not retain control over QHR's work.

In response, Plaintiff points to a list of facts to support her theory that Defendant retained control over the work itself. Many of her assertions, however, find little basis in the evidence submitted. For instance, Plaintiff asserts that Defendant provided equipment to its contractors, but fails to cite any specific evidence, such as a particular page in a deposition, that supports this proposition. In reviewing the evidence submitted, it appears that the only supplies that Defendant provided its contractors were dumpsters. *See* Resp. to Def.'s Mot. for Summ. J., Ex. 9, 54; *see also* Resp. to Def.'s Mot. for Summ. J., Ex. 3, 22. In addition, Plaintiff argues that because the contractors were provided with blueprints during the contract bidding process, and because Defendant inspected the work performed by its contractors, that Defendant controlled the work. An owner, such as Defendant, however, must be allowed to retain some control over the contract, and has a general right to oversee the project. *See Miller v. Great Lakes*

*Steel Corp.,* 112 Mich.App. 122, 315 N.W.2d 558, 560 (1982). Finally, Plaintiff argues that Defendant required its contractors, including QHR, to comply with government imposed safety rules and regulations. Under Michigan case law, however, such a requirement alone is not sufficient as a matter of law to allow a factfinder to find that Defendant retained control. *See id.*

The contract between Defendant and QHR also supports a finding that Defendant had no control over the work performed by QHR. The contract itself states that QHR "shall furnish all labor, material (including shingles, felt, and mushroom vents), equipment, and supervision necessary to complete all work covered under this contract." In addition, QHR "shall be responsible for loading shingles onto roof," and "shall inspect all bundles of shingles prior to installation ...." The contract then dictates various items that QHR is to supply and install, such as flashing and rain diverters. These items all demonstrate that QHR had complete control over the work that they were hired to perform.

Plaintiff points to the same contract to argue that Defendant retained control over the work performed, however, such attempts fail. Plaintiff notes that Defendant retains the right to terminate QHR's services for any reason, and argues that this fact demonstrates control. The Michigan Court of Appeals, however, has held that an owner who retains the contractual right to terminate a contractor who violates the owner's rules and regulations does not, as a matter of law, retain control over the work. *See Miller,* 315 N.W.2d at 560. Plaintiff also point to facts, such as the fact that the contract requires QHR to comply with OSHA and MIOSHA safety regulations, as an incidence of control. As mentioned above, however, such facts are insufficient as a matter of law to constitute control. *See id.* Therefore, the Court

finds that Defendant's contractors, including QHR, were free to perform their work as they chose.

Michigan case law is consistent with this finding. In *Samodai v. Chrysler Corp.*, 178 Mich.App. 252, 443 N.W.2d 391, 393–94 (1989), the Michigan Court of Appeals found that daily contacts with the defendant's employees and the defendant's requirement that its contractors comply with safety requirements was not enough to find that the defendant retained control. The court stated that in order to be held liable, the owner of the property must "retain at least partial control and direction of *actual* construction work, which is not equivalent to safety inspections and general oversight." *Id.* at 393 (emphasis in original). Likewise, in *Portelli v. I.R. Const. Prods. Co., Inc.*, 218 Mich.App. 591, 554 N.W.2d 591, 595–96 (1996), the Michigan Court of Appeals found that the plaintiff's employer, an independent contractor, was solely responsible for all work that was to be performed under the contract, consequently, the court found that the defendant retained no control over the work that the independent contractor performed.

Plaintiff cites cases to support its position, however, those cases are distinguishable. For instance, in *Plummer v. Bechtel Const. Co.*, 440 Mich. 646, 489 N.W.2d 66 (1992), the Michigan Supreme Court found that the defendant, The Detroit Edison Company, retained sufficient control over a construction project to be held liable for the plaintiff's injuries. The Michigan Supreme Court noted the following facts: even though the defendant hired a general contractor, the defendant had 125 of its employees at the worksite, including over twenty inspectors for every discipline that there might be; the defendant retained the right to hire or fire any subcontractor it chose; the defendant had a safety coordinator who was responsible for ensuring that all provisions in the contract regarding safety were carried out; and the defendant's safety coordinator spoke directly with the employees of the defendant's subcontractors. *See id.* at 73. When these facts were viewed together, the Michigan Supreme Court concluded that the jury was free to find that the safety coordinator's "suggestions" to the subcontractors' employees could be found by a jury to be in fact binding on the subcontractors, thus giving the defendant control over safety issues. *See id.*

The present action is factually distinguishable. In the case at bar, Defendant did not have a safety coordinator, or any person with a similar role, who walked around and made suggestions directly to the employees of Defendant's contractors, as did the defendant in *Plummer*; rather, in the present action, all suggestions regarding safety matters were made to the managers or supervisors of Defendant's contractors. *See* Resp. to Def.'s Mot. for Summ. J., Ex. 4, 45. And while Defendant would impress the importance of safety on its contractors during meetings, and would make suggestions to its contractors' managers about safety issues, deposition testimony indicates that Defendant's contractors were primarily responsible for the safety of their own employees. *See, e.g.,* Resp. to Def.'s Mot. for Summ. J., Ex. 4, 44. Thus, it does not appear that Defendant exercised the same degree of control over safety, or any other aspect of the project, as did the defendant in *Plummer*.

For these reasons, the Court finds that Defendant did not retain sufficient control over the project in question to be held liable. Despite this finding, the Court notes that there are still other ways by which Defendant may be found liable.

### C. Common Work Area

■ As previously discussed at length, under Michigan law, an owner may be

liable for an injury that was suffered by the employee of an independent contractor. In Michigan, there is a variation of this rule. Under *Funk v. General Motors,* 392 Mich. 91, 220 N.W.2d 641 (1974), an owner may be liable to the employees of its contractors if:

1) the owner had supervising and coordinating authority over the job site;

2) there is a common work area shared by employees of more than one subcontractor;

3) there is a readily observable and avoidable danger in the common work area, that

4) creates a high degree of risk to a significant number of workers.

*See Groncki v. Detroit Edison Co.,* 453 Mich. 644, 557 N.W.2d 289, 297 (1996) (citing *Funk,* 220 N.W.2d at 646).

■ Based on this theory of liability, Plaintiff argues that the greenhouse roof area was a common work area because employees of several contractors worked on this roof area. Plaintiff argues that, in addition to the roofing work performed by QHR, the carpenters that built the roof, the siders that installed the siding on the house, and employees of the company that installed drainpipes around the greenhouse roof area all worked on the greenhouse roof area, thus making it a common work area. In addition, Plaintiff argues that the greenhouse roof area presented an observable danger that was easily avoidable, and that endangered a number of workers. Finally, Plaintiff asserts that Defendant had supervising and coordinating authority over the worksite.

The Court finds that Plaintiff's claim fails because the second element of the test from *Funk* has not been met. The Court finds that there is evidence that demonstrates that the employees of a number of different contractors were on the greenhouse roof area while the bulk of construction was being performed on the house. But, most of the work on the house was completed at the time of the incident at issue. Apparently, the skylight in the greenhouse roof was installed in an off-center fashion. After the skylight was centered, it needed to be flashed, which is what Mr. Sprague was doing at the time of his fall. There is no evidence that demonstrates that the contractor that actually moved the skylight did so while on the greenhouse roof. In fact, its clear that there would have been very few workers, if there were any at all, that would have done any work on the greenhouse roof area at the time of the incident. For instance, Mr. Scott Carrow testified: "The house was sided at that point. The house was roofed. Possibly completion of the brick was done or close to it. The siding was done on the back of the home, so nobody else would have been on the roof the day Eric was up there." *See* Resp. to Def.'s Mot. for Summ. J., Ex. 9, 31. In short, while the greenhouse roof area may have been a "common work area" at one time, there is no evidence to demonstrate that it was at the time of the incident.

While it is true that Michigan case law states that it is not necessary for employees of more than one contractor to be working in a location at one time to have a common work area, *see Phillips v. Mazda Motor Mfg. (USA) Corp.,* 204 Mich.App. 401, 516 N.W.2d 502, 507 (1994), it is not true that a location always remains a common work area. Even if there is an obvious danger in a particular location, there becomes a point at which there is no longer a "high degree of risk to a significant number of workers," because the workers have ceased working in the common work area. In the present action, assuming that there were a significant number of workers on the greenhouse roof area at one time, the construction work on the house was nearing completion, and there no longer was a "significant number" of workers that would be in danger from being on the

greenhouse roof area. Therefore, the Court finds this theory of liability to be inapplicable.

Plaintiff argues that these are not all of the theories of liability that Plaintiff may present; according to *Funk*, an owner may be liable if the owner negligently selected a contractor.

### D. Negligently Selected Contractor

■ "Ordinarily a land owner is not responsible for injuries caused by a carefully selected contractor to whom he has delegated the task of erecting a structure." *Funk*, 220 N.W.2d at 644. Plaintiff argues that QHR was negligent in failing to require its employees to take proper safety precautions, such as requiring its employees to wear safety harnesses while working on roofs. Plaintiff asserts that Defendant was well aware of the fact that QHR often neglected to use the proper safety equipment, however, Defendant repeatedly retained QHR anyway. Therefore, Plaintiff concludes that Defendant can be held liable for the death of Plaintiff's decedent because it negligently hired QHR to provide roofing services.

Despite the above quoted language from *Funk*, the Michigan Court of Appeals has held that there is no duty requiring an employer to exercise care in the selection of a contractor. *See Reeves v. Kmart Corp.*, 229 Mich.App. 466, 582 N.W.2d 841, 846 (1998). Instead, the Michigan Court of Appeals has held that when a person hires an independent contractor to perform ordinary tasks, then that person may presume that the independent contractor is competent to perform the tasks for which the independent contractor was hired. *See id.* In addition, the court found that the above quoted language was merely dicta because the court in *Funk* "found that the defendant could be held liable for the plaintiff's injuries because it had retained control over the manner in which the work was to be performed, not because it had failed to use care in selecting contractors." *Id.* at 844. Therefore, Plaintiff's argument fails.

### E. Negligent Administration of the Contract

■ Plaintiff's last argument is that Defendant negligently administered the contract, which goes hand-in-hand with her argument regarding control. Michigan law recognizes a claim for the negligent performance of a contract. *See Stiver v. Parker*, 975 F.2d 261, 272 (6th Cir.1992)(quoting *Clark v. Dalman*, 379 Mich. 251, 150 N.W.2d 755, 760 (1967)). Plaintiff basically argues that Defendant retained control over safety at the worksite because it retained the contractual right to terminate QHR in the event that QHR failed to comply with safety standards. Plaintiff also asserts that QHR failed to comply with safety standards, and points to deposition testimony in which Defendant's employees saw QHR's employees on the roofs of houses without the proper safety protection. Therefore, Plaintiff avers that Defendant should have exercised its contractual right and terminated QHR when Defendant became aware of the fact that QHR was in violation of the applicable safety standards, and that its failure to do so constitutes negligent performance of the contract.

Plaintiff's argument misses the point. Michigan law essentially states that if a obligor on a contract has a duty to perform, then he must perform that duty with ordinary care. *See Clark*, 150 N.W.2d at 760. Thus, in order to be liable on the contract, Plaintiff must demonstrate that the obligor, the Defendant, had a duty to perform, and then may show that Defendant's performance of that obligation was negligent. Although Defendant reserved the right to terminate contractors if they refused to adhere to terms of the contract, that did nothing more than grant Defen-

dant contractual control. *See Miller v. Great Lakes Steel Corp.*, 112 Mich.App. 122, 315 N.W.2d 558, 560 (1982). Moreover, QHR was primarily responsible for the ensuring the safety of their own workers. Thus, Defendant did not negligently perform a contractual duty.

**F. Conclusion**

Plaintiff cannot make a successful claim on any theory of liability set forth. Therefore, the Court shall grant Defendant's motion for summary judgment. In addition, the Court shall not analyze Defendant's argument regarding whether the danger was open and obvious, thus obviating Defendant's liability for the incident.

## V. CONCLUSION

For the reasons set forth above, Motion for Summary Judgment on Behalf of Defendant Toll Bros., Inc. is GRANTED.

IT IS SO ORDERED.