**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0702n.06

**No. 10-1809**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jul 03, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| JOHN SMITH; TAMMY SMITH, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | **On Appeal from the United** |
| v. | ) | **States District Court for the** |
| | ) | **Eastern District of Michigan** |
| BREA PROPERTY MANAGEMENT OF | ) | |
| MICHIGAN LLC; BRE SOUTHFIELD, LLC, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before:     **KEITH, BOGGS, and MOORE, Circuit Judges.**

**BOGGS, Circuit Judge.**  This negligence action arises from a serious injury to John Smith, crew member of SDI Exterior Systems, Inc, which he sustained after a scaffold on which he was working blew over.  Smith sought damages from defendants BRE Southfield LLC ("BRE"), which owned the property Smith was working on when he was injured, and BREA Property Management LLC ("BREA"), which was the property manager.  Smith sought to hold BRE and BREA liable for negligence. The district court granted summary judgment for the defendants.  We affirm the district court's decision.

*Factual History*

On April 24, 2007, John Smith was injured in a construction accident at 2000 Town Center in Southfield, Michigan.  Smith worked for SDI, a small company that had been hired to  replace a

portion of siding that ran the full vertical length of the building. Smith was supervised by an SDI employee, Matt Pavlinak, and all his instructions came from Pavlinak. All the equipment SDI worked with—the ladders, scaffold, poles, wood, siding panels—was SDI-owned or, in the case of the siding, ordered by SDI for the client.

In order to replace the siding, it was necessary for the SDI crew to work on a scaffold. The scaffolding had six levels and was about 30 feet high. A worker would stand on each level and screw in the corresponding portion of a piece of siding, so that a piece of the siding could be screwed into multiple stories of the building at once.

On the day of the accident, SDI was the only group performing work on 2000 Town Center. There were no interruptions in the work, except for a 30-minute period during which an electrician employed by BREA removed a light fixture that was in SDI's way. The SDI employees stopped work and took an early lunch while the electrician removed the light. Some barricades prevented foot traffic from coming around the work site, but these had been placed by BREA employees before SDI employees began work that morning.

BREA told SDI that SDI should put a tarp on the building to protect it from weather, because, on April 24, SDI was only partially finished with replacing the siding, and some parts of the interior of the building were exposed. Usually, according to Smith, the tarp would have been screwed into the roof of the building, but Pavlinak said that management did not want SDI to put anything on the roof or screw anything to the roof. This issue had already come up when Smith had wanted to screw the scaffold into the roof, which is "usually how we tie off," but Pavlinak said "we couldn't mess

with the cap [the roof edge] or screw the scaffolding in the top of the roof." He said that if it had been allowed, he would have screwed the scaffold into the roof.

SDI crew members, not including Smith, put the tarp up. However, the right upper flap of the tarp came loose. Two workers went up to fix it: Smith and Gerald (Jerry) James. Smith and James were on the scaffold about 30 feet off the ground. According to Smith, usually the workers would be wearing harnesses at that elevation, but on this occasion they were not. James stated that it was a sunny day with little wind, but that suddenly "a big wind came." Smith described the tarp puffing out from the wall "like a big sail." Smith said that he felt a "wiggle" and that when he looked down, the scaffolding had pulled away from the wall. He said that after he felt the wiggle he helped James get on the roof. James said that he "immediately jumped to the roof and pulled [himself] up on the roof and rolled onto the roof." Smith did not make it to the roof, and "rode" the scaffold down as it fell.

Smith was seriously injured in the accident.

*Procedural History*

Smith and his wife filed suit against BRE and BREA in Oakland County Circuit Court on January 7, 2009, requesting damages for negligence and loss of consortium. On January 27, 2009, defendants filed a notice of removal in the district court, based on the fact that opposing counsel refused to stipulate that damages were equal to or less than $75,000. Because the Smiths, Michigan domiciliaries, BRE, a Delaware company, and BREA, a Delaware company, were diverse, and the

amount in controversy was in excess of $75,000, federal diversity jurisdiction was proper. 28 U.S.C. § 1332(a)(1).

Defendants moved for summary judgment on February 26, 2010. Smith opposed the motion. The district court held a hearing on the summary-judgment motion on May 27, 2010. The court asked Smith to state exactly what exception he was relying on to prove that defendants had a duty to Smith, because owners and general contractors generally do not owe a duty of care to subcontractors and their employees. Smith responded that he was relying on the "common work area" exception and the "retained control" exception. The court asked Smith to explain why he believed the site was a common work area. Smith stated that the presence of the electrician and the security personnel who put up the barriers made it a common work area.

The court disagreed. The court stated that because it had found that there was no common work area, it did not need to reach Smith's second exception of retained control, which applies only if common-work-area liability has been proved. *Ormsby v. Capital Welding*, 684 N.W.2d 320, 329 (Mich. 2004). On June 1, the court entered an order and a separate judgment granting defendants' motion.

This timely appeal followed.

*Standard of Review*

We review the decision to grant summary judgment de novo. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 373 (6th Cir. 2009). Granting summary judgment is appropriate when there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a). When reviewing a summary judgment motion, we do not assess credibility or weigh the evidence. We view the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Federal courts sitting in diversity apply the choice-of-law principles of the forum state. *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425 (6th Cir. 2009). This case, as a diversity action based on claims of Michigan tort law, is governed by Michigan law. *Via the Web Designs, L.L.C. v. Beauticontrol Cosmetics, Inc.*, 148 F. App'x 483, 487 (6th Cir. 2005).

*Analysis*

Smith argues that he presented sufficient evidence to create a fact question as to whether the job site at 2000 Town Center was a common work area at the time of the accident. Smith argues that a common work area exists when "employees of two or more subcontractors will eventually work in the area." *Groncki v. Detroit Edison Co.*, 557 N.W.2d 289, 297 (Mich. 1996). Under this test, Smith argues, the site was a common work area because there were at least ten different workers from three different employers on the work site the day of the accident.

Traditionally, a general contractor or landowner in Michigan is not liable for the negligent conduct of a subcontractor or subcontractor's employee. However, some exceptions to the rule have emerged. The common-work-area exception was recognized in a case involving very large construction sites. *Funk v. Gen. Motors Corp.*, 220 N.W.2d 641, 649–50 (Mich. 1974), *abrogated on other grounds by Hardy v. Monsanto Enviro-Chem Sys., Inc.*, 323 N.W.2d 270 (Mich. 1982). The *Funk* court noted that on large construction sites, the best entity to implement and coordinate

job safety was the general contractor. The court noted that many different subcontractors could be subject to the same hazards on such a site. The court stated, in what has become the defining test for common-work-area liability:

> We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen.

*Id.* at 649.

Common-work-area liability, under which a general contractor is liable for the negligence of a subcontractor, has thus been characterized by Michigan courts as having four elements: (1) the contractor had supervisory and coordinating authority; (2) to guard against readily observable, avoidable dangers; (3) in a common work area; (4) which create a high degree of risk to a significant number of workmen. The Michigan Supreme Court has recently emphasized that a plaintiff is required to prove all four elements. *Ormsby*, 684 N.W.2d at 328 & n.11 ("It is potentially confusing and, indeed, may have misled some courts, that a test with four elements has been referred to by only one of its elements—the 'common work area.' . . . [T]he 'common work area doctrine,' however, has four separate elements, *all* of which must be satisfied . . . ."). Smith has failed to prove the four elements of common-work-area liability.

Smith has made the error discussed by the *Ormsby* court—he has litigated this case as though establishing a common work area is sufficient, and not merely necessary, to establish common-work-

area liability.[1]  The only element of common-work-area liability that he sought to prove below was whether the site was a common work area.  The district court held that Smith failed to prove the site was a common work area.  We agree with the district court's decision.  However, even if we did not agree, Smith's appeal would still fail, because he failed to prove the other three elements that Michigan law requires.

Michigan cases provide a number of different tests for when a common work area exists. Smith, unsurprisingly, urges the most plaintiff-friendly test, under which "[a]ll that is required is that the employees of two or more subcontractors eventually work in the same area." *Candelaria v. B.C. Gen. Contractors*, 600 N.W.2d 348, 353 (Mich. Ct. App. 1999).  A harder test, the test the defendants, equally unsurprisingly, advocate, is that the "high degree of risk to a significant number of workmen" must exist at the time of the accident—thus, employees of more than one contractor must have been working in the area "at the time of the incident."  *Sprague v. Toll Bros.*, 265 F. Supp. 2d 792, 800 (E.D. Mich 2003).

Fortunately, the Michigan Supreme Court has recently provided guidance on the requisites of a common work area.  In *Ormsby*, the court explained that common-work-area liability was created to hold a general contractor responsible for safety conditions in an area in which multiple subcontractors are exposed to the same risk. *Ormsby*, 684 N.W.2d at 328 n.9 (citing *Hughes v. PMG*

---

[1]Smith seemed at first to grasp the multi-step nature of the doctrine at the evidentiary hearing, stating that he was attempting to prove that "[t]he property owner and its agent, the property manager failed to take reasonable steps within its supervisory and controlling authority, to guard against a readily observable and avoidable . . . ."  He also said that he was "relying on all four of the elements" of the common-work-area exception.  However, he never argued the other elements.  He also does not argue them on appeal.

*Bldg., Inc.*, 574 N.W.2d 691, 695 (Mich Ct. App. 1997)). The *Ormsby* court stated that the doctrine

represented "an effort to distinguish between a situation where employees of a subcontractor were

working on a unique project in isolation from other workers and a situation where employees of a

*number of subcontractors were all subject to the same risk or hazard*." *Ibid.* (emphasis added); *see*

*also Lammie v. Indiana Constr. Corp.*, No. 88-1540, 1989 WL 31127, at *3 & n.3 (6th Cir. March

30, 1989); *Washington v. Expo Co. GmbH & Co. Kg.*, No. 03-72581, 2005 U.S. Dist. LEXIS 23940,

*12 (E.D. Mich. Oct. 19, 2005). We read *Ormsby*'s statement of the doctrine, then, as requiring

Smith to prove that SDI employees were subject to the same risk or hazard that caused Smith's

accident as employees of other subcontractors. Smith has failed to do so.

Smith posits that there were employees of three separate contractors on the site the day of the

accident: the SDI employees; the electrician, employed by BREA; and security employees, employed

by the building, who put barricades around or near the site.

However, Smith has failed to establish that the electrician or the security workers were

"subject to the same risk or hazard" as the SDI employees. The electrician, Daniel Szymanski,

employed by BREA, filed an affidavit stating that he performed only 10–15 minutes of work,

removing a light fixture, while the SDI employees were not working. This was corroborated by the

depositions of SDI employees Smith and Pavlinak, who said they took an early lunch break while

the electrician worked. The risk or hazard in this case was not that the scaffold would collapse at

any point, but that the scaffold might collapse during SDI's efforts to attach the tarp. Thus, the

electrician was not subject to the risk posed by the scaffold collapsing—he was not present during

the window in which the workers on site were exposed to the risk of the tarp pulling the scaffold

away from the building. The security personnel, who were never even seen by the SDI employees, also were not subject to the same risk as Smith. Every deposition taken stated that security workers erected the barriers on site before SDI began its work. At the time of the hazardous activity then, and for several hours before, SDI was the only contractor on the site. There were no other subcontractors subject to the same risk as Smith. Therefore, under *Ormsby*'s rationale, Smith failed to establish that the site was a common work area.

## *Conclusion*

For the reasons given above, we AFFIRM the district court's grant of summary judgment for the defendants.