*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ELENA BALANT, Personal Representative of the
ESTATE OF ANDRZEJ R. BALANT,

      Plaintiff-Appellant,

v

ASCENSION PROVIDENCE ROCHESTER
HOSPITAL, UNITED PSYCHOLOGICAL
SERVICES, INC., ANA M. ROTAR, M.D., CARL
E. ALSTERBERG, PH.D., and KAREN
BRICKNER, MA, LLP,

      Defendants-Appellees.

UNPUBLISHED
October 16, 2024
12:12 PM

No. 366645
Macomb Circuit Court
LC No. 2021-003107-NH

Before: RIORDAN, P.J., and YOUNG and WALLACE, JJ.

PER CURIAM.

Plaintiff, Elena Balant, as personal representative of the estate of Andrzej R. Balant, appeals as of right from the trial court's order granting summary disposition under MCR 2.116(C)(10) in favor of defendants, Ascension Providence Rochester Hospital (APRH), United Psychological Services, Inc. (UPS), Dr. Ana M. Rotar, M.D., Dr. Carl E. Alsterberg, Ph.D., and Karen Brickner, MA, LLP, in this medical malpractice action in which plaintiff alleged that the individual defendants' breaches of the standard of care proximately caused plaintiff's husband (the decedent) to commit suicide, and that defendants APRH and UPS were vicariously liable. For the reasons set forth in this opinion, we vacate and remand for proceedings not inconsistent with this opinion.

## I. BACKGROUND

This case arises from the suicide of the decedent in his home on June 2, 2019. Plaintiff filed her four-count complaint on August 24, 2021, in which she alleged professional negligence against Dr. Rotar, Brickner, and Dr. Alsterberg, and alleged liability against both UPS and APRH under theories of vicarious liability.

Plaintiff alleged that after she told the decedent in March 2019 that she wanted a divorce, he began to struggle with his mental health. For example, on March 31, 2019, after the decedent called a suicide hotline and began making threats of suicide in the family home, officers from the Utica Police Department were dispatched to the home. When the police arrived, the decedent was standing in the front door with a firearm to his head and, after a 22-hour police standoff, the decedent surrendered. The decedent was transported to Henry Ford Macomb Hospital (HFMH), where he was held for psychiatric evaluation for eleven days and then discharged for outpatient therapy on April 11, 2019.

On April 17, 2019, the decedent was admitted to a partial hospitalization psychiatric program at Harbor Oaks Hospital with diagnoses that included generalized anxiety disorder and status post suicide gestures/threat. He was discharged on May 3, 2019.

The decedent began his outpatient mental health therapy with Brickner on May 7, 2019, "in follow up to a treatment plan developed by Dr. Alsterberg." The decedent was diagnosed with chronic post-traumatic stress disorder, generalized anxiety disorder, and major depressive disorder, recurrent and severe without psychiatric features. The decedent admitted to Brickner that he had experienced suicidal thoughts "on and off" spanning from 2014 to 2019. Brickner also saw the decedent for outpatient therapy on May 7, 2019; May 21, 2019; and May 30, 2019.

The decedent's session with Brickner on May 21, 2019, took place between 10:10 a.m. and 11.05 a.m. That evening (May 21, 2019) plaintiff flagged down a Sterling Heights police cruiser and advised the police that the decedent had just driven off, threatened to kill himself, and may be armed with a small knife. When the officers located the decedent in a nearby parking lot, he was holding a utility knife and used it to cut/stab himself. He had taken five Norco tablets. The decedent was then taken into custody and transferred to Troy Beaumont Hospital, where he was placed in hard restraints, with a sitter at his bedside.

The following morning, the decedent was assessed by a social worker at Beaumont. Although the decedent had been found by police with a knife to his wrist and threatened to "do it," causing the police officer to grab his wrists in order to stop him from hurting himself, the social worker stated in her note that the decedent denied being suicidal and believed his wife lied about him being suicidal out of spite. The nurse who saw the decedent the night before indicated that the decedent admitted that he had been suicidal, but was not suicidal when the nurse saw him.

The following morning, a Clinical Certificate was authored by Dr. Philip Kilanowski, in support of a Petition For Mental Health Treatment, with a diagnosis that included suicidal ideation. The facts serving as the basis for that determination were as follows: "Patient was found by police to have a knife and threatened to kill himself."

While receiving inpatient treatment at APRH, the decedent was under the care of Dr. Rotar, the attending physician. Dr. Rotar determined that he was not a threat to himself or others, and downgraded his risk of suicide from high-risk to low; however, the records suggest that Dr. Rotar made that determination at 9:51 p.m. on May 22, 2019, without actually having seen or evaluated the decedent. Dr. Rotar evaluated the decedent on May 23, 2019, and diagnosed him with having a major depressive episode, adjustment disorder, and depression. She described him as "very affable, polite, involved, cooperative," and motivated to work on his treatment plan. On the other

hand, a social worker at APRH who examined the decedent determined that he minimized his symptoms and concerning behavior, including interactions with the police and cutting himself, and that he blamed plaintiff and the police for his actions. The decedent was discharged from APRH on May 24, 2019, and returned to outpatient therapy with Brickner on May 30, 2019. Following a trip to northern Michigan with plaintiff, the decedent committed suicide on June 2, 2019.

Plaintiff alleged that all three individual mental health providers breached the applicable standard of care, that their negligence proximately caused the decedent's death, that APRH was vicariously liable for the negligence of Dr. Rotar, and that UPS was vicariously liable for the negligence of Dr. Alsterberg and Brickner. All defendants filed motions for summary disposition under MCR 2.116(C)(10), asserting that no genuine issue of material fact existed on the issue of proximate causation. Defendants also argued that the proposed expert testimony of plaintiff's experts, Lawrence Amsel, Ph.D., and Trevor Small, Psy.D., should not be considered by the trial court because the testimony was not reliable under MRE 702 and MCL 600.2955(1).

Following a hearing, and citing to *Teal v Prasad*, 283 Mich App 384; 772 NW2d 57 (2009), the trial court granted defendants' motions for summary disposition, holding that plaintiff "fails to establish that the defendants' actions were the 'but for' cause of the decedent's suicide." The trial court also dismissed plaintiff's claims for vicarious liability as to defendants APRH and UPS. Having granted summary disposition in favor of defendants, the trial court did not rule on the challenge to the reliability of plaintiff's expert witness testimony. Plaintiff now appeals as of right.

## II. SUMMARY DISPOSITION GRANTED BY TRIAL COURT ON PROXIMATE CAUSE

Plaintiff first argues that genuine issues of material fact exist as to whether defendants' negligence was *a* cause in fact of the decedent's suicide—regardless of whether such negligence was *the* cause in fact as improperly considered by the trial court. Plaintiff asserts that the evidence in support of her theory of causation provides a logical sequence of cause and effect, not impermissible conjecture; thus, defendants were not entitled to summary disposition. We agree.

### A. STANDARD OF REVIEW

All three motions for summary disposition were brought under MCR 2.116(C)(10). This Court reviews the trial court's decision on a motion for summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). As the Michigan Supreme Court has stated:

> A motion under MCR 2.116(C)(10) . . . tests the *factual sufficiency* of a claim. When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ. [*El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) (internal quotation marks and citations omitted).]

B. ANALYSIS

In a medical malpractice action, the plaintiff "bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995).

"Generally, proximate cause is a factual issue to be decided by the trier of fact." *Nichols v Dobler*, 253 Mich App 530, 532; 655 NW2d 787 (2002), citing *Dep't of Transp v Christensen*, 229 Mich App 417, 424; 581 NW2d 807 (1998), citing *Derbeck v Ward*, 178 Mich App 38, 44; 443 NW2d 812 (1989). "However, if there is no issue of material fact, the trial court may decide the issue itself." *Reeves v Kmart Corp*, 229 Mich App 466, 480; 582 NW2d 841 (1998). While courts deciding negligence issues have sometimes used the phrases "a proximate cause" and "the proximate cause" interchangeably, the Michigan Supreme Court has clarified that: "[I]t is well-established that the proper standard for proximate causation in a negligence action is that the negligence must be 'a proximate cause' not 'the proximate cause.' " *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 497; 791 NW2d 853 (2010).[1] "[T]here can be more than one proximate cause contributing to an injury." *Id*. at 496-497.

The issue of proximate cause in a case alleging medical malpractice resulting in a suicide was addressed by the court in *Teal*, 283 Mich App 384. The plaintiff in *Teal* appealed to this Court after the trial court granted the defendants' motion for summary disposition of her claim alleging medical malpractice resulting in the suicide of her husband, Dennis Teal, who had struggled with depression and alcohol abuse. *Id*. at 386. Similar to the present case, the plaintiff in *Teal* initiated divorce proceedings "in the weeks before his suicide." *Id*. As a result, Teal began to drink more heavily and stopped taking his antidepressant medication. *Id*. On March 18, 2004, Teal tried to kill himself by carbon monoxide poisoning in his car, which led to him being held for involuntary hospitalization at the University of Michigan Hospital. *Id*. From there, Teal was transferred to the defendant Herrick Memorial Hospital where he was provided psychiatric services. *Id*. One of the defendants, Dr. Manish Prasad, evaluated Teal, admitted him to the inpatient unit to be monitored for both depression and suicidal intentions and resumed his antidepressant medication. *Id*. at 386-387. Another defendant, the on-call physician, Paul Thielking, found Teal to be more cooperative, and he had apologized for not being cooperative with Dr. Prasad. *Id*. at 387. Teal told Dr. Thielking that he wanted to return to Alcoholics Anonymous (AA), resume taking his

---

[1] By way of example, the court in *Nichols*, said: "Generally, proximate cause is a factual issue to be decided by the trier of fact. However, if reasonable minds could not differ regarding *the proximate cause* of the plaintiff's injury, the court should decide the issue as a matter of law." *Nichols*, 253 Mich App at 532 (emphasis added). The court then held that a question of fact existed on the issue of proximate cause where the defendant was a social host who had allegedly served alcohol to a person who was under the age of twenty-one, after which the underaged person repeatedly hit the plaintiff with a hammer. Because there was clearly another proximate cause of the plaintiff's injury, in addition to the act of the social host serving the underaged person, i.e., the act of the underaged person hitting the plaintiff with a hammer, the court's use of the phrase "the proximate cause" in *Nichols* was clearly interchangeable with the phrase "a proximate cause."

medication, denied suicidal ideation, and expressed a willingness to participate in therapy. *Id*. The following day, Dr. Prasad discharged Teal from the hospital, under instructions that he was to take his medication, live with his mother or sister, continue with follow-up appointments with his therapist or psychiatrist, and he also signed a safety plan agreeing to attend AA meetings. *Id*. at 387-388.

When Teal attended a treatment center on March 29, 2004, he reported to a social worker that he was having recurrent suicidal thoughts, but did not plan to act on them. *Id*. at 388. The following day, Teal attended an appointment with a nurse practitioner, received a prescription for trazadone, and was told to return for a dual-diagnosis evaluation. *Id*. Teal left the center and filled the prescription. *Id.* That same day, Teal called his daughter multiple times, told her he loved her, and that he wanted to call his wife, but if she did not answer, he "was done," because he could not do it anymore. *Id*. Teal's daughter contacted Teal's sister and asked her to check on Teal, but by the time she did so, Teal had hanged himself. *Id*. Twelve days passed from the date of Teal's suicide attempt on March 18, 2004, to the date of his death by suicide on March 30, 2004.

The plaintiff filed a complaint alleging that Dr. Prasad, Dr. Thielking, and others did not properly diagnose and treat Teal, and that he was discharged from the hospital prematurely. *Id*. at 388-389. The plaintiff's expert testified that by not adequately diagnosing Teal's mental health condition and providing adequate treatment for his alcoholism and depression, they violated the standard of care. *Id*. at 389. Had they done so, the expert opined it was more likely than not that Teal would have lived. *Id*. The defendants moved for summary disposition, claiming that the plaintiff had not established a causal link between their actions and Teal's suicide. *Id*. The trial court granted summary disposition, concluding that plaintiff had not established the element of causation. *Id*.

At issue in *Teal* was whether the plaintiff had established that the defendants' alleged breaches of the standard of care proximately caused Teal's suicide. *Id*. at 390. The Court in *Teal*, *id*. at 391, turning to *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004), first defined proximate cause under Michigan law to encompass both cause in fact and legal, or proximate, cause. The Court explained the element of cause in fact:

> The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or "proximate cause" normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences. [*Teal*, 283 Mich App at 391, quoting *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994).]

The Court also recognized that Michigan law requires that, to prove cause in fact, a plaintiff cannot merely show that the defendant "*may* have caused his injuries." *Teal*, 283 Mich App at 392 (quotation marks and citation omitted). Instead of a mere possibility or a plausible explanation, the plaintiff must demonstrate specific facts establishing a reasonable inference of a logical sequence of cause and effect. *Id*. Put another way, a valid causation theory is grounded in facts in evidence. *Id*. If the connection between the plaintiff's injuries is merely speculative or possible, that will not suffice to establish causation. *Id*. In rejecting the plaintiff's contention that the defendants' conduct was the but-for cause of Teal's suicide, the Court reasoned:

Plaintiff fails to establish that defendants' decision to discharge Teal early and without a discharge plan was the "but for" cause of Teal's suicide. Admittedly, if defendants had locked Teal away for the rest of his life without access to a piece of rope or cord, he likely would not have hanged himself at his home on March 30, 2004. But this Court cannot determine whether defendants were the cause in fact of Teal's suicide by imagining every possible scenario and determining whether the likelihood of Teal's death would have diminished in each situation. Instead, the requirement is affirmative: plaintiff must provide sufficient evidence to establish " 'a reasonable inference of a logical sequence of cause and effect,' " *Craig*, [471 Mich] at 87, quoting *Skinner*, [445 Mich] at 174, and not merely speculate, on the basis of a tenuous connection, that Teal would not have committed suicide if he had not been discharged on a given day more than a week before.

In this case, Teal's suicide occurred eight days after his discharge from the hospital psychiatric ward. The evidence presented to the trial court established that Teal had been discharged after he realized that suicide was not the answer to his problems, received medication, and recognized the need to resume attending AA meetings and to receive treatment for his mental condition and alcoholism. When he was discharged, Teal agreed to live with a family member, continue taking psychiatric medications, resume AA meetings, and attend follow-up meetings with a therapist and, if necessary, a psychiatrist. Yet after his discharge, Teal's whereabouts were largely unknown until March 29, 2004. The parties presented no conclusive information regarding Teal's mental state during this time, his changing moods over this time, or whether he was taking the medication prescribed for him on his release from the hospital. Plaintiff also presented no evidence indicating how Teal's discharge, whether premature or not, triggered a chain of events leading to Teal's suicide. In the absence of such evidence, plaintiff's claim that defendants' alleged malpractice caused Teal's death eight days later constitutes mere speculation. [*Teal*, 283 Mich App at 392-393.]

The Court also acknowledged that the parties disputed whether an intervening or superseding cause had occurred to disrupt the chain of causation, such as when the staff at the treatment center did not detain Teal after he expressed he was having recurrent suicidal thoughts, or when the plaintiff did not take his calls. *Id*. at 393. The Court opined that such debate only stoked the fire of speculation to which the parties had resorted in an attempt to identify the cause of Teal's suicide. *Id*. This Court noted that any arguments concerning the causes of Teal's suicide were speculative given the "scant" evidence of his mental state, thoughts, and suicidal ideations following his discharge from the hospital. *Id*. at 394. The Court further reasoned:

This is not a situation in which defendants knew that Teal was suicidal and would kill himself as soon as he had the chance, yet discharged him and watched as he collected rope, made a noose, and hanged himself from a nearby tree. It was not evident in this case that but for defendants' decision to discharge Teal on March 22, Teal would not have killed himself on March 30. [*Id*.]

This Court's conclusions that the plaintiff had not established a reasonable inference, on the basis of a logical sequence of cause and effect, or that the defendants' actions had "triggered" a causal chain leading up to Teal's suicide, were also based on the fact that the plaintiff's expert witness testimony failed to establish "a causal connection between [the] defendants' actions and Teal's suicide." *Id*. at 395. The expert witness testified that he had not been provided much information regarding Teal's whereabouts after being discharged from the hospital. He noted that an intake report prepared by the treatment center on March 29 revealed that Teal was interested in resuming his career in carpentry to occupy his thoughts and his time, but because he had trouble focusing, he was contacting his friends as needed. *Id*. Teal denied suicidal ideations, and the expert witness simply could not point to facts of record or otherwise establish a causal chain to support his opinion that the defendants' decision to discharge Teal from the hospital led to his suicide. *Id*. Because the plaintiff could not prove that the defendants' actions were a cause in fact of Teal's death, they also could not prove that the defendants' actions were a proximate cause of his suicide, and this Court affirmed the trial court's order granting summary disposition in favor of the defendants. *Id*.

On appeal, plaintiff's main argument challenging the granting of summary disposition is that the trial court erred in concluding that the alleged breaches of the standard of care by Dr. Rotar, Dr. Alsterberg, and Brickner were not causes in fact of the decedent's suicide because genuine issues of material fact existed on this issue. We agree.

As this Court recognized in *Teal*, the cause-in-fact prong of proximate cause generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. *Id*. at 391. More specifically, the plaintiff cannot merely engage in speculation and conjecture, but is required to produce evidence and facts that demonstrate what has been described by our Supreme Court as " 'a reasonable inference of a logical sequence of cause and effect[.]' " *Id*. at 392-393, quoting *Craig*, 471 Mich at 87, quoting *Skinner*, 445 Mich at 174. In *Teal*, 283 Mich App at 393, this Court determined that such a connection of cause and effect was not demonstrated, particularly because there was little evidence of the decedent's mental state, thought processes, and suicidal tendencies in the days following his discharge from inpatient hospitalization.

In contrast, the present case is factually distinguishable from *Teal* because the record is replete with evidence establishing that in the months leading to June 2, 2019, the decedent was in a continuous and ongoing state of suicidal crisis, experiencing recurrent "spikes" that would occur whenever plaintiff would talk about ending their marriage. These included a police barricade on March 31, 2019, during which the decedent refused to leave the family home for 22 hours and held a firearm to his head in full view of law enforcement, as well as another instance, almost two months later, in which the decedent refused to get out of his vehicle when commanded by law enforcement, and instead cut his arm in their presence and told them that he planned to end his life. What precipitated both instances of police involvement were the decedent's repeated threats to plaintiff to take his own life. In contrast, the decedent in *Teal*, who died just twelve days after his first suicide attempt, did not have the same lengthy history of spiking and recurrent suicidal threats, as well as actions that involved such outwardly violent and aggressive behavior.

Plaintiff's theory that defendants engaged in medical malpractice alleged that all three individual defendants clearly abdicated their professional obligations to recognize the decedent's

signs of suicidal distress as he was experiencing these ongoing spikes of suicidal crisis from March 31, 2019, until June 2, 2019, and had they not acted negligently, the decedent would not have taken his own life. In response, defendants all argue that they could not be expected to know that the decedent was in distress and experiencing these spikes in suicidal ideation, because the record reflects that he lied, misdirected everyone around him, and denied his suicidal ideation in an effort to either get out of the hospital, or avoid rehospitalization, so he could commit suicide. Defendants also note that plaintiff, who ought to have known the decedent the best of all, as his wife, had no inkling of his suicidal intentions when she said good night to him in the early morning hours of June 2, 2019. However, the expert witness testimony of both Dr. Small and Dr. Amsel was that, even though the decedent lied and engaged in highly manipulative behavior, these medical professionals had an obligation and responsibility to not simply rely on the veracity of his allegations, but to also undertake a parallel and commensurate review of his medical file and law enforcement records, to confirm the accuracy of the decedent's statements regarding his mental and emotional state and whether he was in fact a threat of harm to himself or others. The decedent's medical and law enforcement records revealed a very different story from what the decedent told Brickner, Dr. Rotar, and the staffs at UPS and APRH.

Brickner testified, and the notes of her sessions with the decedent confirm, that she repeatedly asked the decedent if he was planning to harm himself, and he continually answered this question in the negative through May 30, 2019, only days before his suicide. However, during a session with plaintiff on May 13, 2019, plaintiff told Brickner that she was afraid that the decedent may kill himself. Brickner was aware of the police standoff at the decedent's home on March 31, 2019, during which he held a gun to his head, as the decedent repeatedly told Brickner that he had engaged in the police standoff in a ploy to dissuade plaintiff from leaving him, and Brickner believed him. Regarding the incident on May 21, 2019, Brickner testified that in their last session on May 30, 2019, the decedent only told her that he had been holding up a box cutter, and had been superficially cutting his arm during an argument with plaintiff in an effort to stop her from leaving him. The decedent also told her that after 1½ days in the hospital at APRH, the staff there had determined he was not suicidal and he had been discharged. However, Brickner did not verify this information with any other source, and she confirmed that she did not take any further steps to confirm the details of the incident with the police that took place on May 21, 2019. The record also confirms that Dr. Alsterberg reviewed each of Brickner's case notes concerning the decedent, approving and signing off on each of them.

Dr. Small was asked to list everything in Brickner's notes from the May 7 session that supported his opinion that she breached the standard of care. Dr. Small first noted that Brickner did not address the decedent's level of suicidality and access to lethal means. Second, she did not assess the patient's suicidality as a manipulative strategy, a coping skill, or a behavior in which he was planning, and there was no clear determination as to how suicide was a factor in this case and how she planned to treat it. Third, whereas Brickner implemented insight-oriented psychotherapy, Dr. Small opined that she should have worked on behavioral strategies such as identifying triggers, coping mechanisms, or elevations in suicidality. Regarding the May 13 session with plaintiff, Dr. Small opined that Brickner breached the standard of care by suggesting to plaintiff that she should not stay in the marriage by threat, i.e., that she should leave, without providing any support, discussion of tools, or a timeline for plaintiff to aid the therapist in making determinations regarding care. Regarding the May 21 session, Dr. Small opined that Brickner failed to assess the

fact that the decedent was demonstrating a significant decrease in function, failed to have a conversation with him about a psychiatric consultation or that he needed an additional level of care. Regarding the May 30 session, Dr. Small opined that the patient fully denying all suicidal ideation—after eight days prior having a relatively significant suicidal gesture/attempt that required police intervention, and involving the patient slashing himself, overdosing on Norco, and getting into a physical altercation with a police officer—should have been a "red flag" to Brickner, and should have indicated a consultation. He opined that Bricker failed to address the decedent's suicidality and that he should have been evaluated for a psychiatric hold.

Regarding the May 7, 2019 session, Dr. Small opined that Dr. Alsterberg should have contacted the physician who prescribed Norco to the decedent and alerted that physician to the fact that the patient was presenting with a history of suicidality, because opiates can be used for an overdose, i.e., to alert the physician to the situation so that the physician could decide whether to change the patient's medication.

Regarding the May 13, 2019 session between plaintiff and Brickner, Dr. Small opined that, because Brickner suggested to plaintiff that she should not stay in the marriage by threat, and given decedent's history of having become acutely suicidal with the ideation of his wife divorcing him, Dr. Alsterberg should have ensured that additional supports were in place, in case plaintiff did not stay in the marriage.

Dr. Small explained that, with respect to the decedent's May 30, 2019 session, Dr. Alsterberg, in his supervisory capacity, breached the standard of care by not inquiring of Brickner regarding the details of what transpired when the decedent received inpatient treatment at APRH, after the May 21, 2019 session, including the factors that led to that hospitalization. It was also inappropriate for Brickner to discuss job retraining for the decedent at the May 30, 2019 session so soon after inpatient treatment, because the decedent would have needed to attain a "period of psychiatric stability," i.e., they needed first to "get the patient stable." Even more significantly, neither mental health professional recommended that the decedent consult with a psychiatrist. As noted above, Dr. Small also opined that it was "a red flag" that the decedent denied any suicidal ideation to Brickner on May 30, 2019, considering the events that occurred only eight days earlier. Dr. Small said it was illogical that on May 21, 2019, the decedent was cutting his wrists, overdosing on Norco, and involved in a physical altercation with police officers, but on May 30, 2019, he completely denied any suicidal ideation. At the very least, a consultation with, and assessment by, Dr. Alsterberg was in order.

When Dr. Alsterberg's counsel noted that plaintiff did not have any indication when she went to bed early in the morning of June 2, 2019 that the decedent would kill himself, and asked Dr. Small why Brickner or Dr. Alsterberg should have had that mindset on May 30, 2019, Dr. Small explained his reasoning, in pertinent part:

> It's a – it's quite literally a mental health professional looking at the trajectory of this particular matter would, in a middle-of-the-road clinical acumen and expertise, which actually I believe Dr. Alsterberg is higher than that 'cause – cause I do see his – his record. I mean, he looks quite established. *However, a middle of the road clinician would see the trajectory of this patient's care and come*

*to conclusions regarding level of care which would have changed, in my professional opinion, the outcome of the patient's trajectory.* [Emphasis added.]

When counsel for Dr. Alsterberg asked Dr. Small to state "every single fact" that he relied on for his opinion that the decedent's suicidal trajectory could have been altered, Dr. Small testified that as a supervising psychologist, on May 30, 2019, he would have asked to meet with the decedent personally, which would have enabled Dr. Alsterberg to do a more detailed assessment of safety. Before May 30, 2019, Dr. Alsterberg also should have recommended a different level of care for the decedent on the basis of the information that he had available. An increased level of care would have provided the decedent with an additional level of support and increased monitoring, and for the decedent to be seen only once every seven days was a breach in the standard of care. Dr. Alsterberg also should have had a conversation with the clinicians who treated the decedent while he was receiving inpatient treatment at APRH to discuss what they were recommending for future care. A closer monitoring of the decedent as an acute high-risk patient should have led to Brickner and Dr. Alsterberg having discussions regarding changing the level of care for the decedent. Dr. Small opined that Dr. Alsterberg did not provide Brickner, and in turn Brickner did not provide the decedent, with the "skills and tools to deal with these spikes in suicidality." Brickner and Dr. Alsterberg did not provide the decedent with effective interventions that would have supported him in dealing with triggers of suicidality, according to Dr. Small.

In summation, if Dr. Alsterberg had held a conversation with Brickner regarding an appropriate level of care for the decedent on May 30, 2019, or before that day, Dr. Small opined that the decedent's suicide could have been prevented. Dr. Small further opined that had Dr. Alsterberg or Brickner, or both of them, acted in compliance with the standard of care, more likely than not the decedent would not have committed suicide.

Dr. Small's testimony established that genuine issues of material fact remain for trial regarding whether the decedent's suicide would not have occurred but for the alleged negligent conduct of both Brickner and Dr. Alsterberg, i.e., plaintiff has proffered evidence of particular facts supporting "a reasonable inference of a logical sequence of cause and effect" as required by Michigan law. *Teal*, 283 Mich App at 392, quoting *Craig*, 471 Mich at 87.

Turning next to Dr. Rotar, the evidence also yields factual disputes concerning whether her decision to discharge the decedent from APRH was a cause in fact of his suicide.

The record reflects that on May 22, 2019, by way of a clinical certificate, the decedent was admitted to Troy Beaumont Hospital after he was determined to be suffering from depression and suicidal ideation, and the clinical certificate indicated that he was found by the police with a knife, and had threatened to kill himself in their presence. It was recommended that the decedent receive inpatient treatment. On May 22, 2019, a petition for mental health treatment was filed in which the petitioner, Theresa Vrij, a licensed social worker, averred that the decedent had recently admitted to increased feelings of depression with thoughts of suicide regarding plaintiff filing for divorce, his friend dying, and his father having a heart attack. The petition further provided that the decedent had "attempted to cut his wrists and stab himself several times." Vrij's notes of her assessment of the decedent stated that he disclosed feeling increased depression over the past two months after his father's heart attack, his friend dying, and another friend being in a coma after a

motorcycle accident. However, the decedent told Vrij he was not suicidal and that plaintiff had lied about him being suicidal out of spite.

When the decedent was transferred to APRH on May 22, 2019, the social worker's psychosocial assessment and evaluation indicated that the decedent would not allow staff there to speak to plaintiff or any other family members, with the decedent indicating to staff that plaintiff would just say that he should be locked up. In the "presenting problems" portion of the evaluation, addressing the events of May 21, 2019, the decedent reported that he had been sleeping in his car for at least two days in the vicinity of Hall Road and Mound, and when the police approached him and told him to get out of his vehicle, they drew their firearms and physically forced him out of his vehicle after he reached for a cigarette. The decedent acknowledged during the evaluation that he had barricaded himself in the house two months earlier and the police were called. As soon as the police allowed him to speak with plaintiff, the decedent surrendered. The social worker concluded in the evaluation that the decedent minimized the March 31, 2019 police standoff, as well as the incident with the police in the Walmart parking lot on May 21, 2019, stating that if the police had allowed him to have a cigarette, there would have been no problems. The decedent also minimized his self-cutting, stating that he only did it to feel better.

In her May 23, 2019 psychiatric evaluation of the decedent, Dr. Rotar stated that the decedent told her that he was seeing Brickner for outpatient therapy and was honest with her about "having at times passive suicidal ideations," but had realized that he did not want to die. The decedent also reported to Dr. Rotar that he had not abused any narcotics or prescription medication. While the decedent had some superficial cuts from cutting himself out of frustration, he also had deeper cuts that he had suffered after working on his motorcycle. The decedent was very verbal about the stressors in his life, stated that inpatient hospitalization was not helpful, and that his parents and his son were the two main reasons he would not harm himself.

In her May 24, 2019 discharge notes, Dr. Rotar further noted that "[t]here is absolutely nothing to support that the patient has made any suicidal gestures or even comments prior to this hospitalization." Dr. Rotar described the decedent as "future oriented, affable, and appropriately distraught given his life circumstances." Dr. Rotar reported that during the 24 hours that he was held at APRH, the decedent also did not show any behaviors that she found to be worrisome or concerning. Dr. Rotar stated that the decedent did not show symptoms of depression or anxiety, and she considered him a better candidate for outpatient treatment. The decedent also did not give any indication that he was a threat of harm to himself or others, and Dr. Rotar opined that he was not suicidal at the time of discharge.

Again, the record contradicts many of the facts referenced by Dr. Rotar. For example, the notes from the decedent's visit to the HFMH emergency room dated April 1, 2019, state that the decedent was brought to the emergency room by the Macomb County Sheriff's Department after the police became involved when he was making threats of suicide to a suicide hotline. The decedent barricaded himself in his home while armed, and held a gun to his head. The Macomb County Sheriff's Department had tapes of the negotiations with the decedent, and further noted that he took numerous opioids and cut his arm with a razor 25 times. Additionally, the police report of the May 21, 2019 incident indicates that plaintiff flagged down a police cruiser in a parking lot in Sterling Heights, and informed the officer that the decedent had threatened to kill himself and had just driven away in her vehicle, armed with a knife. When a police officer opened

-11-

the car door, he saw the decedent holding a utility knife which the decedent used to superficially cut his wrist. After the police commanded the decedent to drop the knife, the decedent refused to do so, and said "he was just going to do it." Because of the multiple sweatshirts that the decedent was wearing, the officers opted not to deploy their tasers on the decedent, and he was placed in handcuffs and taken into custody. Upon examination, hospital staff found he had "several lacerations to his left upper chest and a laceration to his left upper arm."

Dr. Amsel's deposition testimony establishes that factual disputes remained for the trier of fact with respect to whether, but for the actions of Dr. Rotar in discharging the decedent from the APRH under circumstances in which he was clearly struggling with recurring suicidal spikes under the looming threat of divorce from plaintiff, the decedent's death would not have occurred. To the extent that the decedent told Dr. Rotar that he was looking forward to the future, Dr. Amsel opined that the decedent was looking forward to the future in which he committed suicide and would be out of emotional pain because, for the prior two months, the decedent had been threatening suicide, making his intentions to kill himself clear, stating that he could not be future-oriented without plaintiff. If the staff at APRH had reviewed the decedent's records, Dr. Amsel opined that they would have been aware of this information. He provided testimony as to what Dr. Rotar and the staff at APRH should have done in treating the decedent:

> They would [have known about the decedent's suicidal ideations] if they had reviewed the records, which is what was required of them is to review the records. If a man is brought in by a police department, and he says you cannot talk to his wife. You cannot discharge that man until you really clarify that issue. He's being dragged in by the police for being suicidal. And then he says you can't talk to my wife. So you can't get parallel history from that.

> But the very least you have to do is review every record you can get your hands on. Talk to the outpatient therapist. Look through all his past records. And be very suspicious that a man who's dragged in the by police, and won't let you talk to his wife, is not telling the truth. I mean that is psychiatric emergency room lesson day one.

If Dr. Rotar and the staff at APRH had reviewed the decedent's police records, they would have readily discerned that the decedent was telling "an inconsistent story." Dr. Amsel further explained that Dr. Rotar should have recognized that the decedent was telling a story that was "much too rosy" and concluded that he was lying.

Dr. Amsel acknowledged that while receiving inpatient treatment at APRH, the decedent denied suicidal ideations a total of seven times, but under the circumstances in which the decedent was brought into the hospital—after having an altercation with the police, cutting himself, attempting to overdose on Norco, and threatening suicide—Dr. Amsel would have confronted the decedent about his denial. Dr. Amsel explained, in pertinent part:

> What should have happened at [APRH] is a confrontation about his lying. A confrontation about the fact that [the decedent was] actively suicidal. A demand that he stay in the hospital. And a promise that if he does stay in the hospital, that the staff would keep him there, and work with him, and recognize the incredible

pain that he is going through. And do psychiatric work with him, as long as it took, to the point where he could imagine outliving the divorce. That was the psychiatric task. That didn't happen.

When counsel for Dr. Rotar and APRH inquired if Dr. Amsel could say with certainty that the medical staff at APRH could have "gotten [the decedent] to the point where he could see life after the divorce," Dr. Amsel responded, "[M]ore likely than not I believe they could have done it." According to Dr. Amsel, if this treatment plan had been carried out, the risk of the decedent's suicide would have been reduced.

In contrast to *Teal*, 283 Mich App at 395, where the plaintiff's sole expert witness "could not refer to any facts or establish a causal chain of events that would support his opinion," which was that Teal's physicians' decision to discharge Teal led to his suicide, here the plaintiff's two expert witnesses testified to a list of facts that established a chain of events that supported their opinion, which was that the defendants' alleged breaches in the standard of care led to the decedent's suicide. Based on the record, the issue of proximate cause in this case must be decided by the trier or fact as reasonable minds might differ on that issue. See *El-Khalil*, 504 Mich at 160.

Accordingly, the evidence, viewed in the light most favorable to plaintiff, is such that genuine issues of material fact remain concerning whether the decedent's suicide would have occurred but for Dr. Rotar's decision to discharge the decedent from APRH. Likewise, the evidence also yields genuine issues of material facts regarding whether, but for the alleged breaches of the standard of care by Brickner and Dr. Alsterberg, the decedent's suicide would have happened.

## III. RELIABILITY OF EXPERT WITNESS TESTIMONY NOT ADDRESSED

In its opinion and order granting summary disposition in favor of defendants, the trial court did not address defendants' argument regarding the alleged unreliability of the testimony of plaintiff's expert witnesses. On remand, we instruct the trial court to consider and address the reliability of the expert witness testimony under MRE 702 and MCL 600.2955(1).

We vacate the trial court's order granting summary disposition in favor of defendants and remand for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Adrienne N. Young
/s/ Randy J. Wallace

-13-